UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case No.   12-CV-24367-FAM

**CARLO SERRANO,**

    Plaintiff,

    vs.

**JULIAN HENRY AND GEORGE H. HENRY, III,** as personal representatives of the estate of **GEORGE H. HENRY**,

    Defendants.
_____/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT**

Plaintiff CARLO SERRANO ("Plaintiff" or "Serrano"), by and through his undersigned counsel pursuant to Rule 56, *Federal Rules of Civil Procedure*, Local Rules 7.1 and 56.1, hereby files this response in opposition to defendants JULIAN HENRY AND GEORGE H. HENRY, III, as personal representatives of the estate of GEORGE H. HENRY ("Defendants")[1] renewed motion for summary judgment [D.E. 69] and in support thereof states as follows:

**I.   PRELIMINARY STATEMENT**

This is a securities fraud action that asserts claims pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78, Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, Florida Statues § 517.301 and Florida common law.

---

[1] Where applicable, the term "deceased George Henry" is used to distinguish the actions of the decedent (and whose deposition was taken in this case), from the personal representatives of the deceased George Henry who have since been substituted as "Defendants".

In or about February 2009, Defendant solicited Plaintiff to invest in Pacific Media Direct, a wholly owned subsidiary of Access Television Network. [D.E. 1-4 at pg 13] Pacific Media Direct was created to pursue product development and marketing for Amari Cream, a product that claimed to act as a barrier against viruses that carry sexually transmitted diseases. The Amari project was being funded in part by Access Television Network and numerous private placement offerings solicited by Defendant. [D.E. 1 at ¶ 9] In connection with the solicitation for his investment, Plaintiff was provided with a Pacific Media Direct Subscription Agreement [D.E. 1-3] ("Subscription Agreement") and a Confidential Memorandum dated January 2009 [D.E. 1-4] ("Offering Memorandum"). The undisputed terms of the Offering Memorandum here at issue are as follows:

- That interest will be paid quarterly at a rate of 6.00% and will be senior to all existing and future debt of Pacific Media; [D.E. 1 at ¶ 14(a)]
- That the offering will pay a quarterly royalty of product sales of Amari at a rate of 6% of net sales; [D.E. 1 at ¶ 14(b)]
- That Incentive Interest shall continue for a further twenty-four months after repayment at a rate of 4% (four percent); [D.E. 1 at ¶ 14(c)]
- That assuming no exercise of a call premium, the offering shall be paid in full three years or 36 months from the date of issuance; [D.E. 1 at ¶ 14(d)]
- That the use of proceeds from the offering is to retire in full the existing Access Television $1.6 million senior debt payable to Gladstone Capital and for general working capital purposes including the launch of Amari. [D.E. 1 at ¶ 14(e)]
- That the Amari product will be launched in the first quarter of 2009; [D.E. 1 at ¶ 14(f)]

It is also undisputed that in March 2009, plaintiff signed the Subscription Agreement and deposited a $100,000.00 check payable to Pacific Media Direct into a bank account specified by the deceased George Henry. In September 2009 Plaintiff received from Pacific Media Direct a single interest payment of $2,547.95. Thereafter, no further payments were ever made by Pacific Media Direct. In or about July 2012, Pacific Media Direct filed for chapter 7 bankruptcy protection in the United States Bankruptcy Court for the Southern District of Florida, *In re: Pacific Media*

*Direct, LLC*, Case No. 12-26998-AJC. Shortly thereafter, Plaintiff filed this lawsuit against Defendant asserting causes of action under federal and state securities laws and alleging fraud in connection with the sale of securities.

## II.     ARGUMENT

### A.     Standard of Review

Under Fed. R. Civ. P. 56(c) summary judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and that the [movant] is entitled to ... judgment as a matter of law." *Williams* v. *R.W. Cannon, Inc.,* 2008 WL 4097613, at *6 (S.D. Fla. Sept. 4, 2008). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark* v. *Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). Further, courts "must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party." *Williams,* 2008 WL 4097613, at *6.

Defendants seek summary judgment on Plaintiff's claims of securities fraud pursuant to Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78 and 10b-5 thereunder, 17 C.F.R. §240.10b-5, Florida Statutes § 517.301 and Florida common law. Because Defendants have failed to establish that there is no genuine issue of material fact as to each element of each cause of action, Defendants have failed to carry this burden and the Court should deny the motion for summary judgment.

### B.     The Deceased George Henry's Failure to Disclose Known and Reasonably Foreseeable Risks of the Investment Are Not Protected by the Safe Harbor

Rule 10b-5 prohibits responsible parties from issuing a false or misleading statement of a material fact, and omitting to disclose a material fact that was required to be disclosed or to render other statements that were made not misleading. *See Chiarella* v. *U.S.,* 445 U.S. 222, 235 (1980);

*First Va. Banhhares* v. *Benson,* 559 F.2d 1307, 1314 (5th Cir.1977) (holding omissions are actionable where a person "has a duty to speak"). With respect to misstatements, it is well-settled that Rule 10b-5 prohibits the issuance of half-truths - "if a company chooses to make statement on a subject, having chosen to speak, the company is obligated to make full and fair disclosure under" securities laws. *Jasper Ret. Trust* v. *Jvax Corp.,* 920 F. Supp. 1260, 1267 (S.D. Fla. 1995). In this case, Plaintiff need only prove that the deceased George Henry issued one misrepresentation or omission to survive summary judgment. *See Provenz* v. *Miller,* 102 F.3d 1478, 1484 (9th Cir. 1996) ("In a securities fraud case, summary judgment is improper if a plaintiff shows a genuine issue of fact with regard to a particular statement by the company or its insiders."). Here, the deceased George Henry authored the following statements yet omitted to disclose known and reasonably foreseeable risks of the investment in connection with the Pacific Media Direct/Access Television Network securities offering:

- That interest will be paid quarterly at a rate of 6.00% and will be senior to all existing and future debt of Pacific Media; [D.E. 1 at ¶ 14(a)]
- That the offering will pay a quarterly royalty of product sales of Amari at a rate of 6% of net sales; [D.E. 1 at ¶ 14(b)]
- That Incentive Interest shall continue for a further twenty-four months after repayment at a rate of 4% (four percent); [D.E. 1 at ¶ 14(c)]
- That assuming no exercise of a call premium, the offering shall be paid in full three years or 36 months from the date of issuance; [D.E. 1 at ¶ 14(d)]

In connection with the above unqualified statements, it is undisputed that Plaintiff received only a single interest payment and that Defendant was unable to perform any other term of the offering.

- That the use of proceeds from the offering is to retire in full the existing Access Television $1.6 million senior debt payable to Gladstone Capital and for general working capital purposes including the launch of Amari. [D.E. 1 at ¶ 14(e)]
- That the Amari product will be launched in the first quarter of 2009; [D.E. 1 at ¶ 14(f)]

As to the above unqualified statements, Access Television Network retired only half of the debt payable to Gladstone Capital and it remains debatable whether the Amari product was ever "launched" since it was never offered for commercial sale. [D.E. 30-4, Tr. 88:5-8; 89:4-7]

Contrary to Defendants' argument that these are protected forward-looking statements having nothing to do with performance, the safe harbor provision of the Private Securities Litigation Reform Act, 15 U.S.C. §78u-5(c)(l)(A)(i) and (B), only protects against liability based on forward-looking statements if (1) the statement is identified as a forward-looking statement and accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement, (2) the statement was immaterial, or (3) the plaintiff failed to establish that the person making the statement had actual knowledge that the statement was false or misleading. *Id.* Defendants erroneously contend that each of the above statements and the omission of any statement addressing the known and reasonably foreseeable risks of the investment are, in some manner, protected by the safe harbor.

Defendants' contention fails as none of the challenged misstatements or omissions is forward-looking because (i) none of the misstatements were identified as forward looking statements couched with meaningful cautionary language, (ii) the omitted statements were material to the risk of investment and (iii) the deceased George Henry had actual knowledge that, absent any qualifying statement regarding the risk of the investment, the statements were false or misleading.

In connection with Defendants' unqualified promise to pay interest, royalties and to repay Plaintiff's $100,000.00 investment within 36 months, the deceased George Henry testified as follows:

> Q. Now, as a chairman and CEO of Pacific Media Direct and Access Television Network, [when Plaintiff purchased] in March of 2009, what, if anything, would affect the ability of an investor to have received under the note the interest payments whether it is 6 percent or 10 percent on a quarterly basis? What would have affected the investor's likelihood of [not] receiving interest payments?
>
>         *   *   *
>
> A. If the [Pacific Media Direct] sales were not sufficient. That might impact the ability. If Access Television business was not able to make those payments, that would affect its ability.
>
>         *   *   *
>
> Q. So basically just general company performance of [Pacific Media Direct] and [Access Television Network]?
>
> A. That's correct, yes.
>
> Q. And what potential issues as, during that period of March 2009, were there which affected [Pacific Media Direct] and [Access Television Network] company performance? . . .
>
> A. The launch of the product.

[D.E. 31-1 at 118:24-119:24]. Despite acknowledging the correlation between the performance of Pacific Media Direct and Access Television Network on the one hand, and the likelihood of an investor to receive interest payments on the other, there is absolutely no cautionary or descriptive language. When asked about other challenges facing Pacific Media Direct in connection with the launch of the Amari product, decedent George Henry testified as follows:

> A. There is always uncertainty whether it will be received in the marketplace or not, whether the sales will take off accordingly. The comfort to the investor is that he had, in essence, a back stop if you will, because he had an interest in Access. He had the full faith and credit of Access. So he could evaluate Access as potentially his downside. And if both started to falter, if Access didn't perform and PMD was slow out of the Gates, then you probably would be challenged on receiving these payments.
>
> Q. Do you think it was material to disclose to the investor, the potential investor, that the product may not gain market acceptance?
>
> A. I think everybody knows that.
>
> Q. So you think it is material?
>
> A. To say that?
>
> Q. Yes.
>
> A. As a risk factor?

> Q. Yes.
>
> A. I don't recall it being listed.
>
> Q. Do you think it was material?
>
> A. I think it's implied. The profit, the product was [expected to be] so profitable that whether you sold a 1,000 or 50,000, it had the same cost effect. So is it material? Probably not. Is it material in an ability to service the debt? Probably it had -- it would have an impact.

[D.E. 31-1 at 120:19-119:23]. It is this exact testimony that should have appeared as cautionary language in the Offering Memorandum, describing that there was uncertainty whether the Amari product would be received in the marketplace, describing the uncertainly whether sales will "take off" and, additionally, that if Pacific Media Direct and Access Television Network both "faltered," then interest payments were unlikely and that equity in Access Television Network would be worthless. And he continued:

> Q. So no matter how profitable the product may be, if you don't sell a single unit --
>
> A. Then you got a problem.
>
> Q. -- you got a problem?
>
> A. I would say so.

[D.E. 31-1 at 122:20-121:25]. And when asked specifically about risk factors and cautionary language, decedent George Henry acknowledged that there are none and that he relied exclusively on the "accredited investor" language for his defense:

> Q.  . . . in looking at the offering memorandum, . . . are there any risk factors in the offering memorandum?
>
> A. . . . not as I have seen them in further documents, no. . . .
>
> Q. Does [the Offering Memorandum or Subscription Agreement] this contain one?
>
> A. I think you can, in a specific manner, list no. It's kind of wrapped up in the accredited investor kind of thing.
>
> Q. But what I asked you earlier, what the term "accredited investor" meant as far as you understood it. So now you're -- do I understand you to be telling me, or to be answering the question that it's with the accredited investor statement which somebody assumes the totality of the risk factor in connection with this offering?

7

Keith D. Silverstein, P.A. ● 1177 Kane Concourse, Suite 230 ● Bay Harbor Islands, FL 33154
(T) (305) 868-0200 (F) (305) 868-1045

> A.  I can't connect those dots for you. . . . Do I see a list of risk factors that I'm accustomed to seeing in prospectus, . . .No, I don't. Should there have been there? I don't know. . . .

[D.E. 31-1 at 128:16-129:21]. Defendants' reliance on the "accredited investor" status as the sole defense demonstrates a thorough mis-understanding of the application of "accredited investor" status in unregistered offerings. As described by the U.S. Securities and Exchange Commission:

> Accredited Investors
>
> Under the Securities Act of 1933, a company that offers or sells its securities must register the securities with the SEC or find an exemption from the registration requirements. The Act provides companies with a number of exemptions. For some of the exemptions, such as rules 505 and 506 of Regulation D, a company may sell its securities to what are known as "accredited investors." The term accredited investor is defined in Rule 501 of Regulation D.

See http://www.sec.gov/answers/accred.htm. As further described by the Securities and Exchange Commission, a company seeking to sell securities may avoid the cost and expense of filing a registration statement by selling *unregistered securities* and marketing exclusively to "accredited investors". See http://www.sec.gov/answers/rule506.htm. Contrary to Defendants' argument, however, accredited investor status does not preclude liability for securities fraud pursuant to Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78 and 10b-5 thereunder, 17 C.F.R. §240.10b-5, Florida Statutes § 517.301 and Florida common law.

Defendants argue that despite no meaningful statement addressing the known or reasonably foreseeable risks of the investment, Plaintiff allegedly "understood the inherent risk of the investment" when he acknowledged himself an "accredited investor". Assuming *arguendo* that the statements which accompanied the "accredited investor" acknowledgment (i.e., speculative investment, experience in financial matters, and capable of evaluating risks and merits of the agreement) could qualify as risk factors and cautionary language, Defendants' safe harbor

defense must fail as the warnings were mere "boilerplate." As described by the Court in *Davidco Investors, LLC v. Anchor Glass Container Corp.,* 2006 WL 547989, at * 12-13 (M.D. Fla. Mar. 6, 2006)

> Furthermore, the language that these defendants point to as "meaningful cautionary language" is merely general, boilerplate language that conveys that the analysis undertaken to determine whether any assets were impaired was based on estimates and assumptions and that changes in facts and circumstances could affect the accuracy of the valuations of the assets. Anchor does not identify any factors specific to Anchor that could affect the accuracy of its analysis. Instead, it generally identifies factors that affect all asset impairment analyses by stating that changes in the actual lives of the assets and adverse events and changes in business climates could affect the accuracy of its analysis. Such general statements do not constitute meaningful cautionary language in this case.
>
> The Eleventh Circuit has discussed what constitutes meaningful cautionary language in *Harris v. Ivax Corp.*, 182 F.3d 799 (11th Cir.1999). Specifically, the Harris court stated that meaningful cautionary language will mention important factors that could cause actual results to differ materially from those in the forward-looking statement, but a listing of all factors is not required. Seeid. at 807.As such, the Harris court stated that "when an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward."Id.
>
> In the instant case, the language at issue does not identify important factors that could affect the analysis that was allegedly undertaken to determine if the assets were impaired. As such, the Court rejects the Anchor Defendants' argument that the bespeaks caution doctrine applies in this case.

*Id* at *13. *See also In re Secure Computing Corp. Sec. Litig.,* 120 F. Supp. 2d 810, 818 (N.D. Cal. 2000) (issuer must include enough cautionary language that reasonable minds could not disagree that the challenged statements were not misleading); *In re Nike, Inc. Sec. Litig.,* 181 F. Supp. 2d 1160, 1172 (D. Or. 2002) (citing *Harris,* 182 F.3d at 807) (single sentence warning about "the mix of futures and at once orders" was "too cryptic to be meaningful to the average investor").

Indeed, other than the accredited investor language, Defendants do not cite to any meaningful cautionary language in their safe harbor argument. Defendants' reliance on *Poth v Russey*, 281 F.Supp.2d 814 (E.D. Va. 2003) is misplaced as *Poth* is wholly distinguishable. In *Poth*, the court held that the defendants were entitled to summary judgment because the plaintiffs were unable to raise an issue of material fact "regarding their *unreasonable reliance on unsubstantiated <u>oral</u> statements that were in <u>contradiction</u> to the terms of the Merger Agreement that Plaintiffs signed.*" Id. at 817 (emphasis added). In this case, Plaintiff has not alleged any contradictory statement among the relevant agreements, let alone oral statements, as the basis for Defendants' liability.

Finally, for the reasons discussed below concerning Defendants' scienter, Defendants cannot avail themselves of the safe harbor protection because each of the misstatements and omissions were made with knowledge that the statement was false or misleading. *Davidco,* 2006 WL 547989, at *13 ("forward looking statements may be actionable misrepresentations if the speaker does not genuinely and reasonably believe them"); *In re World Access, Inc. Sec. Litig.,* 119 F. Supp. 2d 1348, 1357-58 (N.D. Ga. 2000) (safe harbor provision is not applicable when defendants are aware of "facts that render their statements untrue when made"). At the very least, a material issue of fact remains for the jury.

      C.    **There are Genuine Issues of Material Fact Regarding Defendants' Scienter**

In the Eleventh Circuit, scienter is defined as an "intent to deceive, manipulate, or defraud," or "severe recklessness." *Mizarro v. Home Depot, Inc.,* 544 F.3d 1230, 1238 (11th Cir.2008). "Severe recklessness" is found when there is "not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* at 1238. Furthermore, where, as here, "defendants

published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter." *In re Friedman's. Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1366 (N.D. Ga. 2005).

Scienter is a fact-specific question reserved for the jury. *SEC* v. *Merch. Capital, LLC,* 483 F.3d 747. 766 (11th Cir.2007) ("Mixed questions of law and fact, such as questions of ... scienter ... involve assessments peculiarly within the province of the trier of fact"); *see also Provez v. Miller,* 102 F.3d 1478, 1489 ("Generally, scienter should not be resolved by summary judgment."). "Scienter can be established by direct or circumstantial evidence," *id.* at 1490, as "there will rarely be direct evidence of intent to defraud." *In re Fleming Cos., Inc. Sec. Litig.,* 2004 WL 5278716, at *11 (E.D. Tex. June 10, 2004); 11th Cir. Pattern Jury Instructions (Civil Cases), §2.1 Consideration of the Evidence ("the law makes no distinction between the weight you may give to either direct or circumstantial evidence").

Defendants challenge scienter in one conclusory statement, that "[t]he complaint must make reference to facts which would prove the Defendant, prior to the Subscription Agreement, intended to commit fraud or that the statements were made in bad faith with no intent to perform." (Def. Mem. at pg 7). In doing so, they ignore the myriad evidence quoted above demonstrating that deceased George Henry knew, let alone recklessly disregarded, the fact that the Subscription Agreement and the Offering Memorandum were tainted with unreasonable assurance and guarantees of performance.

### D. Plaintiff Claim under Section 517.301, Florida Statutes is Not Barred by the Statute of Limitations

In *Medalie v FSC Securities Corporation*, 87 F.Supp. 2d 1295 (S.D. Fla. 2000) the Court addressed the applicable statute of limitations for claims under §517.301 as follows:

> The statute of limitations applicable to Chapter 517 is set forth in § 95.11(4)(e), Florida Statutes, which provides:

11
Keith D. Silverstein, P.A. ● 1177 Kane Concourse, Suite 230 ● Bay Harbor Islands, FL 33154
(T) (305) 868-0200 (F) (305) 868-1045

> Actions other than for recovery of real property shall be commenced as follows:
>
> 4) Within two years.—
>
> e) An action founded upon a violation of any provision of chapter 517, with the period running from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence, but not more than 5 years from the date such violation occurred....

Id. at 1298. This statute has been held to bar any action for violation of Chapter 517, Florida Statutes, commenced after the expiration of five years from the date of the violation regardless of whether the facts giving rise to the cause of action were known by the plaintiff. Defendant argues that Plaintiff should have immediately been on "inquiry notice" when he did not receive the second interest payment. Of course, this argument ignores the fact that the repayment obligation itself did not mature three (3) years later. It was not until Plaintiff demanded in March 2012 that the obligation be repaid at its maturity and subsequently learned of the bankruptcy of Pacific Media Direct in July 2012 (Case No. 12-26998-AJC ) that Plaintiff should reasonably have been on "inquiry notice" to further investigate a possible claim for fraud.

## II.     CONCLUSION

For the foregoing reasons, plaintiff CARLO SERRANO respectfully requests that the Court deny Defendants' motion for summary judgment, together with such other relief as the Court deems just and proper.

Respectfully submitted,

**KEITH D. SILVERSTEIN, P. A.**
1177 Kane Concourse, Suite 230
Bay Harbor Islands, Florida 33154
Telephone: (305) 868-0200
Facsimile: (305) 868-1045

By:     /s/ Keith D. Silverstein
        Keith D. Silverstein, Esq.
        Florida Bar No. 086820
        *Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via the Court's CM/ECF electronic mail notification system, via U.S. First Class Mail, postage prepaid, on this 13th day of June, 2015, upon all parties as set forth on the attached service list and in the manner set forth thereunder.

    /s/ Keith D. Silverstein
Keith D. Silverstein, Esq.
Florida Bar No. 086820

**CM/ECF SERVICE LIST**

Ramon de la Cabada, Esq.                                        CM/ECF
1101 Brickell Avenue
Suite 1103, North Tower
Miami, Florida 33131
(T) 305-443-7100
(F) 305-443-1932
ray@ramondelacabada.com
*Attorneys for Defendants*